UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
ANTHONY TAYLOR, Individually and on :    Civil Action No. 14 CV 0108
Behalf of All Others Similarly Situated, :
                                         :    CLASS ACTION
                    Plaintiff,           :
                                         :    COMPLAINT FOR VIOLATIONS OF THE
       vs.                               :    FEDERAL SECURITIES LAW
                                         :
BARNES & NOBLE, INC., LEONARD            :
RIGGIO, WILLIAM J. LYNCH, JR. and        :
MICHAEL P. HUSEBY,                       :
                                         :    DEMAND FOR JURY TRIAL
                    Defendants.          :
                                         :
———————————————————— x

Plaintiff Anthony Taylor ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Barnes & Noble, Inc. ("Barnes & Noble" or the "Company"), analyst reports on the Company, press releases as well as media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Barnes & Noble between February 25, 2013 and December 5, 2013, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Barnes & Noble and several of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the alleged misconduct was transacted in and emanated from this District.

4.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Anthony Taylor, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased the common stock of Barnes & Noble during the Class Period and has been damaged thereby.

6.     Defendant Barnes & Noble is a New York City-based retailer of books and digital media and digital media devices.  The Company's common stock is listed on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "BKS."  As of February 28, 2013, the Company had approximately 59.9 million shares outstanding.

7.     Defendant Leonard Riggio ("Riggio") founded Barnes & Noble's corporate predecessor in 1965 and has served as its Chairman since 1985.  Defendant Riggio, who owns nearly 30% of Barnes & Noble's common stock, is also the principal beneficial owner of MBS Textbook Exchange, Inc., a Columbia, Missouri-based wholesaler of college textbooks.

8.     Defendant William J. Lynch, Jr. ("Lynch") joined Barnes & Noble in February 2009 as the President of the Company website, barnesandnoble.com, and was named it Chief Executive Officer ("CEO") in March 2010 and a director in October 2011.  Defendant Lynch suddenly resigned from both positions effective July 8, 2013, with no replacement.

9.     Defendant Michael P. Huseby ("Huseby") is, and was throughout the Class Period, the Chief Financial Officer ("CFO") of Barnes & Noble, having been appointed in March 2012.

10.     The Defendants referenced above in ¶¶7-9 are referred to herein as the "Individual Defendants."  Barnes & Noble and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the securities of Barnes & Noble during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

12.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barnes & Noble common stock and other publicly-traded securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Barnes & Noble or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

14.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

- 3 -

(b)      whether statements made by Defendants misrepresented material facts about the business, operations and management of Barnes & Noble; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

16.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

17.      During the 1970s, Defendant Riggio, who founded the Company's corporate predecessor as a college book discount retailer while attending New York University in 1965, purchased Barnes & Noble bookstore which had been operating in New York City since 1917. Defendant Riggio renamed the entire company Barnes & Noble and expanded operations across the country, making Barnes & Noble the pioneer of the "big box" store format.

18.      Throughout the 1980s, the Company continued expanding through acquisitions.  It bought B Dalton Bookseller in 1987 and BookStop in 1989.  Barnes & Noble was taken public in an initial public stock offering in 1993 and established its Internet website in 1997.

19.      Yet Barnes & Noble's successes drew in fierce price competition and the Company was forced to compete for sales with Internet retailers like Amazon.com and other big box discounters like Wal-Mart and Costco who expanded their book selections.

20.      Barnes & Noble invested heavily in its Nook e-book readers launched in 2009 and its digital library.  Facing stiff competition from other devices like Apple's iPad Mini, Amazon's Kindle and Google's Nexus tablet, in April 2012 the Company entered into a partnership with

- 4 -

Microsoft, through which Microsoft took an equity interest in a new NOOK Media subsidiary created to house the Company's digital device, digital content and college bookstore businesses.

21.     During fiscal 2013 (ended April 27, 2013) and fiscal 2014 (ending April 28, 2014), the Company reported in three operating segments:

- B&N Retail: all retail bookstores, including retail Nook product sales, the Company's eCommerce website and publishing operations;

- B&N College: all college and university campus bookstores, including their Nook product sales; and

- NOOK: the Company's digital businesses, including the Company's eBookstore, digital newsstand and sales of Nook devices and accessories to third party distributors, as well as to B&N Retail and B&N College.

22.     The Class Period starts on February 25, 2013. On that day, in response to rumors that began swirling in the financial media early in the day before the opening of trading that Defendant Riggio had approached the Barnes & Noble Board about taking the Company's booksale business private, Barnes and Noble issued a press release stating, in pertinent part, as follows:

> Barnes & Noble, Inc. [BKS], the leading retailer of content, digital media and educational products, today announced that its Board of Directors has received notice from Mr. Leonard Riggio, the Company's founder, largest stockholder and Chairman of the Board, that ***Mr. Riggio plans to propose to purchase all of the assets of the retail business of Barnes & Noble***. Mr. Riggio's plans with respect to a proposal are set forth in an amendment to his Schedule 13D filed today with the SEC.
>
> The process of evaluating a proposal and negotiation of any transaction will be overseen by a Strategic Committee of three independent directors: David G. Golden, David A. Wilson and Patricia L. Higgins, who is Chair of the Strategic Committee. The Strategic Committee has selected Evercore Partners to serve as its financial advisor and Paul, Weiss, Rifkind, Wharton & Garrison LLP to serve as its legal advisor.
>
> There can be no assurance that the review of Mr. Riggio's proposal or the consideration of any transaction will result in a sale of the retail business or in any other transaction. There is no timetable for the Strategic Committee's review. The Company does not intend to comment further regarding the evaluation of Mr.

Riggio's proposal, unless and until definitive agreements for a transaction are entered into or the Strategic Committee determines to conclude the process.[1]

23.     Because the press release concealed the **reasons** that Defendant Riggio wanted only the Retail segment, and specifically, why Defendant Riggio did not want to acquire the NOOK segment, the market was elated.  On this news, the Company's stock price closed up more than $1.50 per share on February 25, 2013, or more than 10%, on unusually high trading volume of more than 6.5 million shares trading, or more than five times the average daily trading volume over the preceding ten trading days.

24.     Then on February 28, 2013, the Company issued a press release announcing its third quarter 2013 financial results (for the interim quarter ended January 26, 2013) and fiscal year 2013 financial guidance (for the interim quarter and fiscal year ending April 27, 2013).  The Company reported a third-quarter loss amid weak Nook sales and a slowdown in its retail stores.  However, the price of Barnes & Noble's stock climbed more than 8% in intraday trading after Defendant Lynch spoke during a conference call following the issuance of the press release confirming that the Company was indeed actively considering Defendant Riggio's bid to take the B&N Retail assets private, with Defendant Lynch stating: "We can't comment further on Len Riggio's plan to make a proposal to purchase the Retail business, *other than to confirm ongoing discussions between Len and the Strategic Committee of the Board*."  Defendant Lynch also confirmed plans for NOOK Media to be self-sufficient financially by managing costs and generating cash flow in the B&N College segment and said the Company had already taken steps to significantly reduce the costs and overhead of the digital consumer business.  During the conference call, Defendant Lynch repeatedly emphasized the strength of the Company's Nook business, confirming the Company was still committed to Nook tablet production, stating, in pertinent part, as follows:

---

[1]     All emphasis is added unless otherwise noted.

Since we launched the digital business in 2009, we've ramped expenses in capital quickly to build out the platform and fuel the growth. The results of this investment is that *we built one of the world's most valuable catalogs of digital copyright content for books, magazines and educational materials, as well as a digital bookstore service that contains approximately a 25% share of the eBook market and an over 35% share of the digital subscription market in the U.S.* We are working to complete the global expansion of the NOOK digital content and retailing service in approximately 10 countries, selling in over 10 languages by this summer. Now that we have built this global asset, we are actively in discussions to leverage our valuable technology and content platform to sell digital content through partnerships. Similar to the partnership, we struck with Microsoft on Windows 8. Partnerships are one of the key strategies for growth for our NOOK digital content business and *we are encouraged by the status and breadth of discussions we're in the midst of*. Even with the decline in NOOK unit sales in Q3, we grew digital content sales 7%, so we've demonstrated we can grow our content business without having to grow hardware sales.

*At the same time, I want to be clear about the fact that we continue to remain committed to the e-Reader and Tablet business going forward.* We're extremely proud of the award-winning line of products we've created. In fact, we're proud of all the products we ship, including our mobile apps for iOS and Android, which are the highest-rated reading apps in both iTunes and Google Play. From a marketing and sales standpoint, regardless of what happens, our bookstores and NOOK will continue to have a close relationship for the foreseeable future. *Our bookstores have made a significant contribution to NOOK's success over the past three years, and in turn, our award-winning line of NOOK products has proven to be a strong driver of traffic to our stores.*

25.     Defendant Huseby also provided the following fourth quarter and fiscal 2013 guidance during the February 28th earnings conference call:

For fiscal 2013, the company continues to expect retail comparable bookstore sales to decline on a percentage basis in the low to mid-single digits. College comparable store sales are now expected to decline on a percentage basis in the low single digits. NOOK Media revenue, which includes the NOOK and College businesses, is expected to be approximately $2.5 billion for the year.

The company now expects fourth quarter NOOK segment EBITDA losses to be comparable to last year's fourth quarter loss of $77 million. Given the holiday device sales shortfall and the associated impact on subsequent digital content sales, coupled with the previously discussed product and component inventory markdowns totaling $74 million, *the company now expects fiscal year 2013 NOOK segment EBITDA losses of approximately $375 million*.

26.     As a result Defendants' bullish mantra about the status of the buyout talks with Defendant Riggio and the Nook segment's purported impending turn to profitability, despite the disappointing third quarter 2013 financial results, which was usually its strongest, and the tepid fourth quarter 2013 guidance, the Company's stock price closed up 3.3% that day, closing at $15.74 per share.   According to Peter Wahlstrom, an analyst at Morningstar, Inc., the price of the Company's common stock increased because "people [were] getting more comfortable with management's ability to change the Nook model to make it more viable, and that could lead to the unlocking of value through separation."

27.     On March 7, 2013, Barnes & Noble filed its quarterly financial report on Form 10-Q with the SEC, which was signed by Defendant Huseby and certified as to veracity under the Sarbanes Oxley Act of 2002 by Defendants Lynch and Huseby.  The Form 10-Q stated that the total assets of NOOK had increased in value from $649,511 at January 28, 2012, to $823,570 at January 26, 2013.  The Form 10-Q stated that the Company's "[m]erchandise inventories decreased $29.9 million, or 1.7%, to $1.785 billion as of January 26, 2013, compared with $1.815 billion as of January 28, 2012, yet stated that "NOOK inventories were relatively flat with the prior year."

28.     On March 18, 2013, the Company amended its employment agreement with Defendant Lynch, explicitly providing that Defendant Lynch would: (i) receive a $1.8 million cash bonus for facilitating the Microsoft and Pearson investments; (ii) receive 300,000 restricted stock units that would not vest for three years, and would not vest at all if Lynch was fired "for cause" in the interim, but would entitle Lynch to receive any dividend payments declared on those shares prior to their vesting; and (iii) *critically*, provided the Company with the right to assign Lynch's employment to NOOK as CEO of NOOK in connection with any separation of NOOK from the Company, and providing that in the event of such an assignment, Lynch would be entitled to a cash

retention bonus in the amount of $1.5 million that he would be required to repay in full if his employment was terminated "for cause" during the first year following NOOK's separation from Barnes & Noble.  Essentially, this set the stage for spinning off NOOK from Barnes & Noble to facilitate a sale of the B&N Retail assets to Defendant Riggio.

29.    Then, on May 9, 2013, *Tech Crunch* reported that it had reviewed Microsoft documents obtained from confidential sources demonstrating that Microsoft was in the process of making a $1 billion offer to purchase the entire NOOK operating segment.  As *Forbes* reported that day: "Microsoft offered $1 billion for the Nook business, after investing $300 million in it last April. . . .  TechCrunch, which broke the news, says internal documents show a $1.66 billion valuation for the Nook."  The *New York Times' Dealb%k* added "[s]hares of Barnes & Noble skyrocketed in early trading . . . after a report said Microsoft was offering $1 billion for the digital assets of the bookseller's e-reader business."  *Reuters* confirmed that "[a] source familiar with the documents cited by TechCrunch confirmed their authenticity," adding that while "[i]t was not clear from the TechCrunch story whether Microsoft had formally made an offer to B&N or whether B&N had replied," "B&N and Microsoft declined to comment," ***including refusing to deny the rumor***. *Bloomberg News* reported that "Barnes & Noble jumped the most in a year following a report that Microsoft [] is planning to offer $1 billion to buy the Nook Media unit."  *The Wall Street Journal's* report that day captioned "B&N Investors See Windows Open" stated that "[w]hile the report hasn't been confirmed—the companies were mum—the market's reaction shows investors are hungry for B&N to do something about the Nook business.  And Microsoft, especially at that price, would be a sweet solution."  *CNN Money* emphasized that same day that: "a $1 billion check could be the bookseller's saving grace."  The Company's stock price closed up 24% on May 9, 2013.  Then over the next several days, as media outlets around the country reported that when directly questioned,

Barnes & Noble continued to refuse to deny the billion dollar Nook buyout rumor, the price of Barnes & Noble's stock price continued spiraling, trading above $23 in intraday trading by May 13, 2013.

30.     Defendants' false statements maintained, and at certain times increased, the stock price inflation in Barnes & Noble's stock price throughout the Class Period, with the stock trading above $23 per share in intraday trading on May 13, 2013.

31.     Meanwhile, by falsely inflating the Company's financial performance, and thus artificially inflating the price of Barnes & Noble common stock, Defendants were able to portray the illusion of Nook being a valuable billion dollar business to Microsoft, to Microsoft's investors and to Barnes & Noble's investors.

32.     However, the Company's stock price would decline $3.24 per share, or more than 15%, on unusually high trading volume between June 11 and June 13, 2013, as the invent community became aware earlier that week, that the Company had reportedly stopped supporting the stand alone versions of its Nook reader software, instead diverting Nook users to web-based versions.  With some of Barnes & Noble's e-book offerings not supported by the web-based version, however, the move was interpreted by the market to mean that the Company no longer considered e-books as an important part of its overall business strategy.

33.     Then, following the Company's June 25, 2013 disclosures, before the opening of trading, announcing that: (i) Nook sales had dramatically declined during the fourth quarter 2013 (ended April 27, 2013); (ii) the Company would shutter its Nook manufacturing operations altogether; (iii) it would take an $18.3 million impairment charge on its Nook assets; (iv) it had written down its Nook inventory by an additional $133 million; (v) it was now expecting fiscal 2014 Retail losses in the high single digits; (vi) it had over-accrued certain accounts receivables; (vii) it

was unable to provide timely audited financial results for fiscal 2013; and (viii) the Company might be forced to restate its previously reported financial results, the price of Barnes & Noble stock, which had traded as high as $23 per share in intraday trading during the Class Period, plummeted, closing down **more than 23%** from its Class Period high to close at $15.61 per share on June 25, 2013, **erasing more than $442.5 million in market capitalization**.

34.      Thereafter, on July 8, 2013, Barnes & Noble announced that Defendant Lynch was resigning – effective immediately – and that the Company had no immediate plans to replace him – essentially abandoning the Company's costly venture into Nook.

35.      On July 29, 2013, the Company completed its previously-disclosed earnings restatement, reporting, in pertinent part, in its Current Report on Form 8-K issued that day, that:

On July 24, 2013 management of Barnes & Noble, Inc. (the "Company") concluded that the Company's previously issued financial statements contained the following filings with the Securities and Exchange Commission (the "Commission") should no longer be relied upon because of a material error contained in such financial statements: *the Quarterly Report on Form 10-Q for the quarterly period ended on January 26, 2013 filed on March 7, 2013*; the Quarterly Report on Form 10-Q for the quarterly period ended on October 27, 2012 filed on December 6, 2012; the Quarterly Report on Form 10-Q for the quarterly period ended on July 28, 2012 filed on August 31, 2012; and the Annual Report on Form 10-K for the fiscal year ended April 28, 2012 filed on July 27, 2012. On July 26, 2013 the audit committee (the "Audit Committee") of the Board of Directors of the Company concurred with and approved the recommendation of the Company's management. The Company's management and the Audit Committee discussed the matters relating to the restatement of the quarters of fiscal 2013 with Ernst & Young LLP, the Company's independent registered public accounting firm, and matters relating to the restatement of the financial statements included in the Annual Report on Form 10-K for fiscal 2012 with BDO USA LLP, the Company's prior independent registered public accounting firm. All dollar amounts below are presented in thousands of dollars. The Company is including certain restated financial statements and financial information with respect to such periods in its Annual Report on Form 10-K for the fiscal year ended April 27, 2013 to be filed with the Commission on or about the date of this Current Report on Form 8-K.

*The restated financial statements reflect that the Company overstated certain accruals for the periods prior to April 27, 2013, as a result of inadequate controls over the accrual reconciliation process at its distribution centers*. In accordance with ASC 250-10-S99-2, Considering the Effects of Prior Year Misstatements when

- 11 -

Quantifying Misstatements in Current Year Financial Statements (ASC 250), the Company recorded an adjustment to decrease cost of sales by $6,700 ($4,027 after tax), $8,460 ($5,084 after tax) and $10,167 ($6,110 after tax) to correctly present the income statements for fiscal year ended April 28, 2012, the fiscal year ended April 30, 2011 and the fiscal year ended May 1, 2010, respectively. The Company also decreased accounts payable by $96,200 and $89,500 at April 28, 2012 and April 30, 2011, respectively; *increased income taxes payable included in Accrued Liabilities in the consolidated Balance Sheets, by $18,598 and $14,939 at April 28, 2012 and April 30, 2011, respectively*, and increased retained earnings by $78,588 and $74,561, net of tax at April 28, 2012 and April 30, 2011, respectively. The Company also decreased accounts payable by $81,040 and increased retained earnings by $69,477, net of tax to correct the consolidated balance sheet for the cumulative impact in periods prior to fiscal 2010.

In addition, in reviewing the Company's components of deferred income tax assets and liabilities, the Company determined that deferred income tax liability in the amount of $26,026 was related to a transaction in which gain was reported for both accounting and tax purposes prior to 2010. Accordingly, the Company has concluded that this deferred income tax liability should be reversed. In accordance with ASC 250, the Company recorded an adjustment to decrease deferred tax liability and increase retained earnings by $26,026 at May 1, 2010. The cumulative effect of these adjustments increased previously reported retained earnings by $95,503 at May 2, 2010.

In fiscal 2013, the Company had not accrued a tenant allowance related to one of its properties in fiscal 2012. The Company recorded an adjustment to increase receivable, net and other long-term liabilities by $9,450 in fiscal 2012.

36.     Then, on August 20, 2013, before the opening of trading, Barnes & Noble issued a press release disclosing much worse company-wide financial results for the Company's first quarter 2014 (for the quarter ended July 27, 2013) than the market had been led to expect, including lower sales and losses that more than doubled from the first quarter 2013, and that Defendant Riggio had placed his bid on hold to take the bookstores private. The Company's first quarter 2013 financial report showed the core bookstore business was also declining, with Barnes & Noble losing $87 million, or $1.56 a share, in the quarter, compared with a loss of $39.8 million, or 76 cents a share, in first quarter 2013. Company-wide revenues fell 8.5% to $1.33 billion, with retail store revenues falling 9.9% from a year earlier. And contrary to Barnes & Noble's already dour June 2013 guidance that its retail stores would show a sales percentage decline "in the high single digits"

- 12 -

during fiscal 2014, the retail stores' profit—as measured by earnings before interest, taxes, depreciation and amortization—*fell 15%* to $65 million in the first quarter 2014. For company-wide EBIDTA, Barnes & Noble reported a loss of $9 million, up dramatically from its profit of $6 million in the first quarter 2013. On this news, the Company's stock price plummeted on August 20, 2013, declining more than $2 per share, approximately 12%, to close at $14.61, on extremely high trading volume of more than 11 million shares trading, or 14 times the average daily trading volume over the preceding ten trading days.

37.     Finally, on December 5, 2013, Barnes & Noble revealed in a filing with the SEC that the SEC had notified the Company on October 16, 2013 that the SEC had commenced an investigation into Barnes & Noble's past accounting, including its decision to restate earnings for fiscal 2011 and fiscal 2012, announced on July 29, 2013. Barnes & Noble also disclosed that the SEC was looking into a former employee's allegations that Barnes & Noble had improperly allocated "certain information technology expenses" between its Nook and consumer bookstore group in its financial reporting. The filing also disclosed that after a review of Barnes & Noble's deferred tax assets and liabilities, it had "concluded" that a deferred tax liability should be reversed.

38.     On this news, the price of the Company's stock declined almost $2 per share when trading resumed on December 6, 2013, *or 12%*, on unusually high trading volume of more than 7.2 million shares trading.

39.     The statements in ¶¶22, 24-25 and 27 were each materially false and misleading because they failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them, that:

(a)     Nook sales were significantly diminishing during the Company's fourth quarter 2013 (ended April 27, 2013), falling 34% from the same quarter in fiscal 2012;

(b)      Barnes & Noble was required to take *$133 million* in inventory charges in the Nook segment during the fourth quarter 2013, on top of the *$59 million* in inventory charges it had already taken during the third quarter 2013, for total Nook inventory charges of *$222 million* during fiscal 2013;

(c)      rather than the $375 million loss on Nook in fiscal 2013 forecast on February 28, 2013, *one month into the fourth quarter*, the Nook segment was actually then on track to lose *$475 million* during fiscal 2013 – or an additional $100 million during the fourth quarter;

(d)      rather than being "committed to the e-Reader and Tablet business going forward" as emphatically stated on February 28, 2013, Barnes & Noble planned to shutter its money-losing Nook tablet production altogether;

(e)      Defendants had known during the Class Period that the Company's Nook assets were impaired by at least $18.2 million;

(f)      Barnes & Noble's failure to take a timely impairment charge on its Nook assets caused the Company to overstate the value of its assets and understate its current-period expenses in the third quarter 2013, and to overstate financial expectations for fiscal 2013;

(g)      the Company knew its B&N Retail segment sales would decline in the *high single digits* during fiscal 2014;

(h)      the Company had inappropriately accrued certain accounts payable in prior periods;

(i)      Barnes & Noble was improperly holding a deferred tax liability on its books;

(j)      Barnes & Noble had incorrectly overstated certain accruals for the periods prior to April 27, 2013 related to its distribution center, requiring that it restate its financial reports for the fiscal years ended April 28, 2012 and April 30, 2011; and

(k)     as a result, the Company would be unable to timely report its fourth quarter and fiscal 2013 financial results and would be forced to restate previously-reported financial results for fiscal years 2011 and 2012.

40.     The market for Barnes & Noble common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Barnes & Noble securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Barnes & Noble securities relying upon the integrity of the market price of Barnes & Noble securities and market information relating to Barnes & Noble, and have been damaged thereby.

41.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Barnes & Noble securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

42.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Barnes & Noble's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Barnes & Noble and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants'

materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Barnes & Noble securities was removed and the price of Barnes & Noble securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

### ADDITIONAL SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Barnes & Noble, their control over, and/or receipt and/or modification of Barnes & Noble's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Barnes & Noble, participated in the fraudulent scheme alleged herein.

### NO SAFE HARBOR

44.    Barnes & Noble's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

45.     The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Barnes & Noble who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE;
## FRAUD ON THE MARKET

46.     Plaintiff will rely upon the presumption of reliance established by the fraud-on the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Barnes & Noble securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

47.     At all relevant times, the market for Barnes & Noble securities was efficient for the following reasons, among others, that:

(a)      as a regulated issuer, Barnes & Noble filed periodic public reports with the SEC; and

(b)      Barnes & Noble regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

48.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding Barnes & Noble's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

49.      During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Barnes & Noble securities and operated as a fraud or deceit on Class Period purchasers of Barnes & Noble securities by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls.   As the Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Barnes & Noble securities fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of Barnes & Noble securities during the Class Period,

Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5
Against Defendants Barnes & Noble, Lynch and Huseby**

50.     Plaintiff incorporates ¶¶1-49 by reference.

51.     During the Class Period, Defendants Barnes & Noble, Lynch and Huseby disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     These Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Barnes & Noble securities during the Class Period.

53.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Barnes & Noble securities.  Plaintiff and the Class would not have purchased Barnes & Noble securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against Barnes & Noble and the Individual Defendants

54.     Plaintiff incorporates ¶¶1-53 by reference.

55.     The Individual Defendants acted as controlling persons of Barnes & Noble within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Barnes & Noble securities, and in the case of Defendant Riggio, his ownership of the debt securities of Barnes & Noble, among other things, the Individual Defendants had the power and authority to cause Barnes & Noble to engage in the wrongful conduct complained of herein.  Barnes & Noble controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 8, 2014

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

Attorneys for Plaintiff

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Price/Share |
|---|---|---|---|
| BKS | 4/26/2013 | 20 | $18.10 |
|  | 5/14/2013 | 20 | $20.70 |
|  | 5/15/2013 | 23 | $20.40 |
|  | 5/21/2013 | 58 | $21.72 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Price/Share |
|---|---|---|---|
| BKS | 5/16/2013 | 63 | $19.94 |
|  | 12/6/2013 | 58 | $15.03 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _3_ day of _J AN_, 2013 in _Overland Park, Kansas._
                                                City           State

(Signature) X _____

(Print Name) _Anthony Taylor_

2